Whitaker, Judge,
and Jones, Chief Judge, dissenting in part:
Chief Judge Jones and I are of opinion that the amount which Judge Laramore and Judge Madden say the plaintiff is equitably entitled to recover is excessive. We would not recommend the payment of more than $50,000, and from this we would deduct the judgment of the District Court in the amount of $22,537.50.
On December 5, 1946 the defendant wrote plaintiff advising it that decontamination of tracts 113 and 166, the tracts in controversy, was 100 per cent complete, and requested plaintiff to release defendant from claims arising from bursting explosives, but plaintiff refused to do so.
Defendant then advised plaintiff as follows:
Prior to returning custody of the land covered by the aforementioned lease to you the property was thoroughly inspected by a Bomb and Shell Disposal Team and all explosives that could be found were destroyed or rendered harmless. Every precautionary measure was taken by the War Department to make the property safe for public use. This included the use by the Bomb and Shell Disposal Team of modern instruments of detection to assist them in locating the various types of ammunition and explosives.
It is believed that all ammunition and explosives on the property have been located and rendered harmless. In the event that duds, bombs, mines, or any other type of explosives are found on the premises at any time it is requested that this office be promptly notified. Upon receipt of such notice action will be taken to dispatch experienced personnel to the property for the purpose of destroying or making the explosive harmless. No attempt should be made to move or otherwise disturb the explosive.
But on December 30, 1946, defendant withdrew its assurance of complete decontamination, and notified plaintiff that another team would work on said tracts between the 1st *47 and 15th of January 1947. A little over a month later, defendant advised Congressman Vinson that additional de-dudding would be necessary because the areas were heavily grassed and that it would be necessary to burn them over and search them again “to insure that no live ammunition remains.”
Then on February 11 the plaintiff was notified that the Bomb and Shell Disposal Specialist had given further study to the matter, after which defendant was able to assure plaintiff that it was safe to mine tracts 163 and 166, and that defendant hoped that plaintiff would proceed with its activities. No mention was made of tract 113.
Notwithstanding this, on February 20 defendant advised Congressman Vinson that some further work remained to be done. Thereafter, an eight-man team of military personnel made an examination of the tracts, found some high explosive shells and destroyed them. Thereafter, the War Department issued a Certificate of Dedudding, dated April 9,1947, which read as follows:
This is to certify that all lands within Camp Wheeler. Georgia have been given a careful visual inspection and have been cleared (with exception of 16.61 acres by metes and bounds survey and shown on Real Estate Drawing No. 1/288 Camp Wheeler, Georgia) of all dangerous and/or explosive materials reasonably possible to detect. To the best of my knowledge and belief, this range will not require additional dedudding to render safe for public use.
Then in the fall of 1947 another inspection over a three-week period was made of the premises, and again, during the period from March to June 1949, a team of 16 men first burned over the tracts, and then, linking hands, they walked up and down the tracts, and also walked crisscross over them. Live duds were flagged and destroyed later by demolition experts.
Again, on March 24, 1949, a Certificate of Dedudding was issued as to tract 166. This reads as follows:
All lands within Tract No. 166, Camp Wheeler, Georgia, as shown on drawing (Real Estate, Camp Wheeler, Military Reservation) dated 5/13/43, have been given a careful visual inspection and have been cleared *48 of all dangerous and/or explosive materials reasonably possible to detect.
To the best of my knowledge and belief, this tract will not require additional dedudding to render safe for public use.
On the same day a clearance report was issued as to tract 113 certifying to the removal or destruction of certain high explosives, rocket grenades, and ground signal flares, all of which were found in restricted areas 1 and 2 on tract 113.
Again, in the fall of 1949, another officer and his team made another survey of the property. They found no live high explosive shells. He then issued a Certificate of De-dudding, reading as follows:
All land within:
Tract No. 113, Camp Wheeler, Georgia as shown on Drawing No. 5343 Sheet 2 of 2 Real Estate Map of Camp Wheeler, Georgia, dated 13 May 1943, has been given a careful visual inspection and has been cleared of all dangerous and/or explosive materials reasonably possible to detect.
To the best of my knowledge and belief this tract will not require additional dedudding to render safe for public use (with exceptions as listed) :
EXCEPTIONS: 35.313 acres of land as hatched on Map No. Wheel 291 A marked Area “1”, and described in legal description attached hereto.
21.473 acres of land as hatched on Map No. Wheel 291 A marked Area “2”, and described in legal description attached hereto.
It is recommended that the above described excepted area be fenced and posted, and that it be restricted from any use whatsoever.
This certificate was issued after six surveys conducted over a period of three years.
The result of all this is that the Army, after all these surveys, certified that all high explosives had been removed, except in areas 1 and 2 in tract 113. There were 35 and a fraction acres in area 1, and 20 and a fraction acres in area 2.
Now, in finding 25a the trial commissioner finds that the overburden on the entire tract 113 was 875,000 cubic yards, but there were only 40,000 cubic yards in areas 1 and 2, which were excepted from the Certificate of Dedudding issued September 28, 1949.
*49 At 12 cents a cubic yard, the figure .used by Judges Lara-more and Madden, the additional cost of removing the overburden on these tracts would be $4,800.00. However, the trial commissioner does find that “it is reasonable to conclude that: a. There lie buried and undetected at various and unknown locations within the top 6 feet of the unrestricted area of tract 113 * * * a small number of unexploded HE shells, lethal in character.” Judges Laramore and Madden adopt this finding. We cannot dispute it, but we think the recommendation of an increase over the judgment of the District Court to a total of $105,000, to take care of this contingency, is excessive. We cannot recommend more than enough to bring the total amount to be paid plaintiff up to $50,000.00, including the judgment rendered by the District Court.
CONCLUSION
Plaintiff has no legal claim against the United States for restoration of its property under the lease agreement. Plaintiff however does have a claim based upon moral and equitable principles, and it is recommended to the Congress that in its wisdom an award be made to plaintiff on that basis. Judge Laramore and Judge Madden are of the opinion that the award be in the amount of $105,000. Chief J udge J ones and Judge Whitaker are of the opinion that the amount of the award should be no more than $50,000. In the event that Congress decides to make an award to plaintiff, the court is unanimous in the view that it should deduct therefrom the amount of the District Court judgment of $22,537.50 which plaintiff still has the right to receive.
FINDINGS OF FACT
The court, having considered the evidence, the report of Trial Commissioner C. Murray Bernhardt, and the briefs and argument of counsel, makes findings of fact as follows:
1. Plaintiff is a New Jersey corporation engaged in the mining, processing and selling of kaolin in Twiggs County, Georgia.
2. Kaolin is a white clay used principally as a filler and coater in the manufacture of paper. It is also used in ce- *50 ramies, paints, pharmaceuticals, and cosmetics. High grade deposits of kaolin accessible to transportation and water facilities and suitable for use in paper manufacture are not abundant in the United States, most of them being found in small areas in Georgia and South Carolina. Although the present supply meets existing demands, the consumption and the price are constantly increasing. These factors make an adequate reserve supply of kaolin land an indispensable prerequisite to the continued operation of plaintiff and its competitors in a highly competitive industry. Plaintiff is the world’s largest producer of kaolin. Kaolin is found in its natural state under an overburden of earth varying from a few feet to depths of over 100 feet. Its preparation for commercial use involves: (a) removal of the overburden of earth; (b) excavation of the exposed clay; (c) transportation of the excavated clay to a processing plant; (d) processing or refining of the clay at the plant prior to shipment.
3. The plaintiff owns a large quantity of kaolin-bearing land in central Georgia, and owns and operates there facilities for processing and sale of kaolin, including a plant, railroad sidings, spur lines, and a network of haul roads. In 1926 it acquired 175 acres of unimproved land hereafter referred to alternatively as tract 166 or the Asbell property. In 1940 it purchased 670 acres of adjoining unimproved land hereafter referred to alternatively as tract 113 or the Wil-lingham Birdsey property. Both of these kaolin-bearing tracts lie in Twiggs Comity, Georgia, within 4.7 miles of plaintiff’s plant, and were acquired as part of plaintiff’s kaolin reserve.
4. In 1940 the city of Macon, Georgia, undertook to obtain for the nearby and newly established Camp Wheeler the use of a quantity of land near the camp as a military maneuver or training area. At the request of the city officials and for patriotic reasons the plaintiff, in October 1940, reluctantly leased to the city of Macon for a term running until June 30, 1945, later extended to June 30, 1946, tracts' 113 and 166 described in the preceding finding 3, for the recited consideration of $1 per year. Later in 1940 the city of Macon sublet both tracts to the United States, along with other nearby properties similarly obtained from their owners, for use as *51 a training area adjunct to Camp Y/heeler, all witK plaintiff’s knowledge and reluctant permission.
The lease provided in part as follows:
* * * the Lessee, if required by the Lessor, shall, before the expiration of this lease, as the same is subject to renewal, restore the premises to the same condition as that existing at the time of entering upon the same under this lease, reasonable and ordinary wear and tear and damage by the elements or by circumstances over which the Lessee has no control, excepted, * * *.
* * * * *
6. Any and all claims for damage to the leased presses and under the terms hereof are determinable according to the value of said premises as of the date of this lease, and no such damage shall be determined upon the basis of the appreciated value of said premises occasioned by the use of and/or development upon said property or surrounding properties by the lessee, successors, assigns, or sublessees. * * *.
5. a. Pursuant to the lease and sublease defendant occupied and used plaintiff’s property as a military training area for the training of recruits from 1941 to sometime in 1945. Two firing ranges, known as the Iverson and Bartow ranges and lying just outside of the northern and eastern boundaries of plaintiff’s tract 113, converged their fire on a hill, referred to herein for convenience as Kaolin Hill, lying in the center of tract 113 and some 2,500 and 1,500 feet distant from the Iverson and Bartow range firing positions, respectively. The ranges were separated from Kaolin Hill by a valley or ravine.
b. Iverson range was a combat range where trainees were indoctrinated in simulated battle conditions by advancing under overhead shelling tmvard Kaolin Hill through the valley separating it from Iverson range. From Iverson range were fired 105 mm. howitzers, 60 mm. and 81 mm. mortars, machine guns and 30 caliber rifles. Bartow range was a training range where supervised trainees aimed and fired 60 mm. and 81 mm. mortars. In general, howitzers and mortars are short-barrelled, low muzzle velocity cannon, which lob their projectiles to targets in a higher trajectory than does a gun, the mortar shell describing a steeper trajectory than the howitzer shell. Both are capable of vary *52 ing their trajectories by adjusting elevation and range settings and by regulating the amount of the impelling charge loaded into the shell prior to firing. Such shells came in several types, including he (high explosive), smoke (emits white smoke on contact with target to screen troop movements), practice (containing a black powder pellet which detonates on contact to produce a puff of smoke for spotting purposes), training (containing sand, wax, plastic, or other nonexplosive ballast), and illuminating (illuminates targets at night). Of the enumerated types only the he fragmentizes on detonation. In the others the base plate on the shell on detonation is forced off by a chemical charge which then emits gases to perform its prescribed function. The nonexplosive type of shell does not fragmentize on detonation and is dangerous to personnel and property only through exposure at close range to its emission of fumes or chemical heat, as contrasted to the lethal characteristics of the exploding he type of shell.
c. Reconciling conflicts in the record, it is concluded that most of the mortar shells fired from the Bartow range were of the non-HE type, that a substantial quantity of he shells, particularly 105 mm. howitzers he, were fired from the Iver-son range, that both ranges were in active use 5*4 days each week throughout the period of the original lease, and that far in excess of 100,000 shells, collectively, of the described types, including a large number of he’s were fired from the two ranges at Kaolin Hill during the period of the original lease. Exact records of the quantities and types of shells used during the stated period, if kept, were not available at trial.
d. Safety boundaries were established by the defendant «within which fire directed from Iverson and Bartow ranges &t Kaolin Hill was to be confined. However, due to the inexperience of trainees aiming and firing the mortars under supervision, errors of the trained personnel demonstrating the aiming and firing of howitzers, inherent lack of precision in such weapons, variation in impelling charges with which the projectiles were loaded, and defective ammunition, a substantial number (albeit a small percentage) of shells were fired over or off to the sides of Kaolin Hill instead of into it. *53 Some landed beyond the safety boundaries. Others rico*-cheted off Kaolin Hill and came to rest beyond the safety boundaries.
e. Of the many thousands of shells fired at Kaolin Hill from Iverson and Bartow ranges from 1941 to 1945, a small percentage, numerically numerous, were duds, i. e., shells that failed to detonate upon contact with the targets due to defect or accident. Hud 60 mm. and 81 mm. mortar shells were more common than dud 105 mm. howitzer shells. It was the military practice to place a warning flag on the location of each dud as its failure to detonate was observed, and at the close of each day’s activities to retrieve or otherwise dispose of the duds. It cannot be said that all were discovered in these daily procedures. Because of their steep trajectory, their weight and shape, and their velocity in descent, dud mortar and howitzer shells which failed to detonate on landing buried themselves either wholly or partially as deep as 6 feet in the earth at the point of contact, depending on the texture of the earth. A buried dud shell of the size here involved leaves a small hole to signal its presence. Its location is often difficult to detect, however, due to closing of the aperture by erosion of the soil in the passage of time. Erosion also sometimes reveals buried shells by washing away the earth covering, particularly on hillsides. Substantially all of the dud shells landed on Kaolin Hill, but it is reasonable to conclude that some landed beyond or to the sides.
6. The lease as extended expired June 30, 1946. Plaintiff requested the return of its property and was informed in September 1946 by the defendant that the property would be released to the plaintiff on or about November 20, 1946, “as soon as dedudding of the premises is completed”, which term referred to the defendant’s procedures then in progress to search both tracts and remove therefrom all unexploded ammunition so as to render the property safe for use.
7. In the meantime the defendant hired a private contractor to “dedud” certain areas of plaintiff’s property. Only the impact or target areas of tract 113 were searched on this occasion. The search was a visual inspection performed by a team of men. The area searched was covered with underbrush which obscured vision. The object of the *54 searcli was limited to removal of all live or unexpended ammunition and to probe any holes which might conceal buried duds. No effort was made to remove shells that were considered not to be dangerous. All duds that were found were flagged and later disposed of by demolition specialists. No scrap metal or shrapnel was removed from the areas searched. An undisclosed number and type of live dud shells, described as “not too many”, were found and disposed of, mostly on Kaolin Hill but some on tract 166.
8. a. On November 20, 1946, the defendant advised plaintiff that the release of the property would be delayed until February 1,1947, or until the purchasers of certain improvements placed on the property by the defendant were able to remove the improvements. On November 27, 1946, the defendant wrote plaintiff that it would be given the right of immediate entry on tracts 113 and 166 if it would agree to the following condition expressed in the letter:
In consideration of this right of immediate entry, Georgia Kaolin Company does hereby release the United States from all claims and liability for restoration or damage, provided, however, that it is expressly understood that this waiver does not include or affect any and all damage or claims which might have arisen prior to this date on account of the occupancy of the United States.
b. To this offer the plaintiff replied on November 29,1946, accepting the offer of immediate entry provided the terms contained the following reservation of rights:
In consideration of this right of immediate entry, Georgia Kaolin Company does hereby release the United States from all claims of liability for any contract damage under its lease with the City of Macon, provided, however, that it is expressly understood that this waiver will not include or affect any claim for damages of any kind and character whatsoever which might have arisen prior to this date on account of the occupancy of the United States, and particularly will not waive any rights arising by reason of any damage to Georgia Kaolin Company, its officers, agents or employees or third parties to whom it might be liable by reason of any unexploded shells, duds, ammunition, bombs, or like explosives, if any exist, left on said premises by reason of *55 the use of said land for military purposes in connection with Camp Wheeler.
9. On December 5,1946, the defendant wrote advising the plaintiff that decontamination of Camp Wheeler (presumably including tracts 113 and 166) was 100 percent complete, and consenting to a release reserving to plaintiff claims arising from bursting explosives. On December 7, 1946, plaintiff notified defendant that it intended to resume possession of its property December 10, 1946, because it was badly needed in its business, and asked confirmation of the complete decontamination of both tracts, since it desired not to expose its personnel to the unnecessary hazard of mining in areas still contaminated. To this defendant replied on December 9,1946, in part as follows:
Prior to returning custody of the land covered by the aforementioned lease to you the property was thoroughly inspected by a Bomb and Shell Disposal Team and all explosives that could be found were destroyed or rendered harmless. Every precautionary measure was taken by the War Department to make the property safe for public use. This included the use by the Bomb and Shell Disposal Team of modern instruments of detection to assist them in locating the various types of ammunition and explosives.
It is believed that all ammunition and explosives on the property have been located and rendered harmless. In the event that duds, bombs, mines, or any other type of explosives are found on the premises at any time it is requested that this office be promptly notified. Upon receipt of such notice action will be taken to dispatch experienced personnel to the property for the purpose of destroying or making the explosive harmless. No attempt should be made to move or otherwise disturb the explosive.
10. a. Coincidentally the defendant, on December 6,1946, wrote to Honorable Carl Vinson, a United States Kepresent-ative from the State of Georgia who was making inquiries on plaintiff’s behalf, that:
Decontamination was completed at Camp Wheeler on November 27, 1946, and all salvageable improvements have been removed from Tracts 113,163 and 166, which it is understood the Georgia Kaolin Company wishes to utilize. On November 27,1946, the Keal Estate Project *56 Manager called on Mr. John B. Harris and granted a Right of Entry to the Georgia Kaolin Company on these three tracts, it being understood that the Right of Entry is subject to the approval of the City of Macon and to the terms and conditions of the lease which the Government has with the City pending execution of the Supplemental Agreement terminating the lease. This Right of Entry has not been signed and returned to this office.
b. The city of Macon consented to plaintiff’s reentry on December 27,1946.
11. Contrary to its previous advice given plaintiff, the defendant, on December 30,1946, advised plaintiff as follows:
This will acknowledge your letter of December 24, 1946 regarding discovery of a dud on the DeFore property. As advised in telephone conversation of December 27, 1946, this office has been informed that certain areas at Camp Wheeler have not yet been approved as to decontamination, although completion had been reported. Portions of Tracts 113, 163 and 166 are involved in areas not yet certified and, accordingly, the Georgia Kaolin Company should be cautioned against the use and occupancy of said tracts until further notice.
This office has been informed that a team will work said tracts between the 1st and 15th of January 1947, and you will be advised upon the clearance of said tracts at the earliest practicable date.
12. On February 5,1947, the defendant advised Congressman Vinson, in behalf of plaintiff, in part as follows:
Colonel Gillette informs me that additional dedudding may be required on the impact areas, and because of the fact that these areas are heavily grassed, it will be necessary to burn over and research them in order to insure that no live ammunition remains. It is contemplated that this work will be completed early this month.
# # * * *
Colonel Gillette further reports that the disposal of Camp Wheeler has been given priority, that all improvements have been sold, and that removal of improvements from the site is nearing completion. Immediately thereafter, negotiations will be conducted for the return of the premises to the individual owners. It is anticipated that all negotiations will have been completed by 15 February 1947.
*57 13. a. On February 11, 1947, defendant wrote plaintiff in part as follows:
This matter has again been studied by the Bomb and Shell Disposal Specialist on duty with this office. Tracts 163 and 166 are not within the area which will be restricted to surface use. Approximately one acre of land in the extreme southwest corner of Tract 163 is shown on the map as being within the contaminated area; however, this area was merely set aside as a safety zone. A map showing the exact boundaries for the restricted areas is being reproduced and will be furnished you within the next few days.
The Custodial Officer, Camp Wheeler, Georgia, is being furnished a copy of this letter with appropriate instructions.
This office hopes that this information will clear up any doubt as to whether or not Tracts 163 and 166 are safe for mining and that you will proceed with your activities.
Note that the foregoing letter makes no reference to tract 113. The tract 163 referred to in the letter is property owned by plaintiff and adjoins tract 166 on the southeast.
b. By letter dated February 13, 1947, the defendant enclosed to plaintiff the map referred to in the letter of February 11, and advised that upon this map “has been delineated certain areas restricted to surface use only”. The map showed a majority portion of tract 113 to be “restricted to grazing only”, but none of tract 166 to be so restricted. Other areas so restricted were shown on the map in lands adjoining or close to tracts 113 and 166.
14. By a letter dated February 20, 1947, the defendant advised Congressman Vinson on behalf of plaintiff as follows:
Eeference is made to your letters of 8 February and 12 February 1947, and inclosures, advising that further work remains to be done to make the DeFore and Wil-lingham properties at Camp Wheeler, Georgia, safe for mining operations by the Georgia Kaolin Company.
In view of the conflicting information as to the condition of these properties, I have instructed Colonel George W. Gillette, Division Engineer, Corps of Engineers, at Atlanta, Georgia, to investigate this matter again and to furnish me a report thereon at the earliest *58 practicable date. Upon, receipt of bis report, I shall be pleased to communicate with you further.
15. By its letter to defendant dated March 11, 1947, the plaintiff stated in part as follows:
Georgia Kaolin Company is engaged in mining kaolin, and the real estate covered by the lease to the City of Macon, and in turn taken over by the United States Army for use by Camp Wheeler, was purchased or leased by our client prior to the outbreak of the war largely for the clay deposits thereon. It is manifest that in doing this mining, there must be no condition which would cause the operations of our client to be dangerous to the lives of its employees. It was for this reason that we have been insistent that proper decontamination work be done in this area so that we might be definitely informed which portions of this land might be unsafe. Our client is not willing to send its employees onto this property to mine it if it is not considered safe for such purpose.
# * * >;« ❖
Although the lease of Georgia Kaolin Company with the City of Macon expired by its terms on July 1,1946, and it has now been nearly a year since that time, Georgia Kaolin Company still has not begun mining on this DeFore lease, or any of its other properties.
In our conference with Capt. Wagner last week, he stated that he would see Mr. D. F. Lewis, Assistant to the Vice-President of Geoi’gia Kaolin Company at Dry Branch, go over the property with him and inform him whether it was safe for our client to proceed with its mining operation. We are informed that Capt. Wagner told Mr. Lewis that the property was free for mining purposes, but placed thereon a provision that our client “must be cautious”.
Capt. Wagner told us in our conference that the map which had been furnished us showing unsafe areas was not correct.
Will you, therefore:
(1) Confirm Capt. Wagner’s statement to us in connection with the map which has heretofore been sent to us;
(2) Advise us whether it is now safe for Georgia Kaolin Company to proceed with its mining operations; and
(3) Advise what is meant by the statement of Capt. Wagner that our client “must be cautious in its mining”.
*59 We believe that you will readily understand that we desire to get all matters straightened out before Georgia Kaolin Company permits its employees to go in and upon this property for the purposes for which it was acquired.
While the foregoing letter was primarily in reference to the so-called DeFore property, which plaintiff had leased for purposes of mining, it referred also to tracts 113 and 166. Certain restricted areas of tract 113 were necessary for access to the DeFore property.
16. In reply the plaintiff, on March 18, 1947, wrote to defendant in part as follows:
The War Department has completed the dedudding of the Camp Wheeler Reservation. All approved known methods of search and demolition have been utilized and every reasonable precaution taken to remove all unexploded shells from the area. To the best of our knowledge and belief, the reservation is free and clear of unexploded missiles with one exception. That part of the hill in the Bartow Range, which was used as the impact area for the 105’s and heavy mortar, has been cleared on the surface to the same degree as the rest of the reservation, but we are not able to certify within reasonable limits that there are no explosives beneath the surface.
In connection with this one small area, this office will immediately take the following action:
a. Within the next week or earlier if the material can be procured before, flags will be staked out encircling the area on which we have doubts as to the subsurface of the land.
b. The District Engineer at Savannah, Georgia will be requested to proceed at the earliest possible date with a metes and bounds survey of the area, and the description of such will be incorporated in the Supplemental Agreement with your clients or the appropriate owner of the land. *60 form of negligence in unnecessarily endangering the lives of your employees and others. * * *
*59 Mr. Gulley of this office will personally attend to placing the flags and will do so in company with a representative of the Georgia Kaolin Company, who is to be designated by Mr. D. F. Lewis.
We regret the necessity of imposing any form of restriction, even on this small portion of the land, and yet to do otherwise would, in our opinion, constitute a
*60 17. a. The dedudding referred to in the immediately preceding letter consisted of the first dedudding inspection in the fall of 1946 (finding 7, sufra), and a second dedudding operation in March 1947 by a private contractor engaged by defendant. On this latter occasion the dedudding inspection was confined to an area in tract 113 probably corresponding to the area shown on defendant’s map of February 13, 1947 (finding 13 b, supra), as “restricted for grazing only”. The contractor burned off the underbrush in advance to facilitate the visual inspection. His contract required him to explode all live shells found, to remove shrapnel, and to probe any openings in the ground indicative of buried duds. They found a number of live shells and hand grenades in the vicinity of Kaolin Hill, many of them partially buried. Some live 105 mm. howitzer shells had missed Kaolin Hill and rolled down into unrestricted areas.
b. Also about this same time an eight-man team of military personnel made a visual inspection (not an exhaustive search) of tracts 113 and 166, most of which was covered by underbrush hindering vision. On tract 113 they found 60 mm. and 81 mm. light mortar shells, both he and smoke, on Kaolin Hill in the restricted area, in addition to expended mortar shells. Live shells found were destroyed. On tract 166 they found and removed about thirty 105 mm. howitzer smoke shells, all expended, and all lying on the surface as though they had been found elsewhere and deposited there.
c. As a result of the dedudding inspections and searches an authorized officer of the War Department issued, on April 9, 1947, a Certificate of Dedudding reciting as follows:
This is to certify that all lands within Camp Wheeler, Georgia have been given a careful visual inspection and have been cleared (with exception of 16.61 acres by metes and bounds survey and shown on Keal Estate Drawing No. 1/288 Camp Wheeler, Georgia) of all dangerous and/or explosive materials reasonably possible to detect. To the Best of my knowledge and belief, this range will not require additional dedudding to render safe for public use.
*61 The map accompanying the certificate of dedudding delineated an area of 16.61 acres, all except a small fraction being in tract 113, bearing the notation “Dangerous impact area— not completely decontaminated to date. 4r-l-47.” This restricted area in tract 113 was included in but much smaller than the area shown on defendant’s map of February 13, 1947 (finding 13 b, supra) as “restricted to grazing only.”
d. In the fall of 1947 another military inspection was made of the area. This inspection took three weeks. Its object was to check on the work done under the previous de-dudding contracts. This inspection was confined to previously restricted areas and impact areas.
18. a. During the period March-June 1949 tracts 113 and 166 were again dedudded. A team of 16 men, including 7 military specialists, 8 civilians, and 1 demolition technician, searched tract 113 for the equivalent of 11 days, and a team of 8 military personnel searched tract 166 for the equivalent of 4 days. Portions of tract 113 were burned over in advance to facilitate the search. The searchers linked hands and, in a moving line, visually inspected both tracts in even lanes, up and down and crisscross. Live duds were flagged, and destroyed later by demolition experts. Equipment such as mine detectors was not used in the search because it is of no value for such purposes.
b. On May 24,1949, a Certificate of Dedudding was issued as to tract 166 which read as follows:
All lands within Tract No. 166, Camp Wheeler, Georgia, as shown on drawing (Real Estate, Camp Wheeler, Military Reservation) dated 5/13/43, have been given a careful visual inspection and have been cleared of all dangerous and/or explosive materials reasonably possible to detect.
To the best of my knowledge and belief, this tract will not require additional dedudding to render safe for public use.
Simultaneously a clearance report was issued certifying that no explosive objects were destroyed and no military scrap disposed of.
c. Also on May 24,1949, a clearance report was issued as to tract 113 certifying that a negligible amount of scrap *62 metal was removed from the tract, and that the following explosive objects were destroyed:
6 — 81 mm. mortars, he
27 — 60 mm. mortars, he
4 — 2.36" rocket grenades
4 — M17A1 ground signal flares
All of the he mortars referred to as being destroyed were found in restricted areas 1 and 2 on tract 113. There were no live he duds found outside the restricted areas in the 1949 dedudding projects. No 105 mm. howitzer he shells were found in either tract, although two live 105 mm. howitzer smoke shells were found and not reported. Apparently only the he types of explosives were reported, and none of the other types, such as smoke shells, because they were not considered as being either explosive or dangerous. The officer supervising the dedudding considered all of tracts 113 and 166, outside of restricted areas 1 and 2 on tract 113, to be 99 percent safe for mining, admitting, however, there was a slender possibility of buried duds remaining in either tract.
19. After completion of the dedudding described in the-preceding finding 18, the officer in charge of the military team was replaced by another officer. The successor officer and his team also searched tracts 113 and 166 in early fall 1949 in the same manner as before, and found no live 105 mm. shells on either tract and no trace that 105 mm. howitzer he shells had ever been fired into either tract, a departure from the weight of contrary testimony. He found evidence that 60 and 81 mm. mortars, and 105 mm. howitzer smoke shells had been fired into tract 113. This successor officer executed a Certificate of Dedudding as to tract 113 on September 28,1949, reading as follows:
All land within:
Tract No. 113, Camp "Wheeler, Georgia as shown on Drawing No. 5343 Sheet 2 of 2 Real Estate Map of Camp Wheeler, Georgia, dated 13 May 1943,
has 'been given a careful visual inspection and has been cleared of all dangerous and/or explosive materials reasonably possible to detect.
*63 To the best of my knowledge and belief this tract will not require additional dedudding to render safe for public use (with exceptions as listed):
EXGEPTIONS: 35.313 acres of land as hatched on Map No. Wheel 291 A marked Area “1”, and described in legal description attached hereto.
21.473 acres of land as hatched on Map No. Wheel 291 A marked Area “2”, and described in legal description attached hereto.
It is recommended that the above described excepted areas be fenced and posted, and that it be restricted from any use whatsoever.
Attached to said Certificate of Dedudding was a map delineating restricted areas 1 and 2 on tract 113, containing, respectively, 35.80 acres and 20.477 acres, except for a small portion (approximately 1 acre) of restricted area 1 which runs over into an adjoining property. Eestricted area 2 is located in the northern corner of tract 113 and is an extension of a larger restricted area extending into land adjoining tract 113 on its northwest side. In fixing the boundaries of restricted areas 1 and 2 the officer included a safety margin of 15 to 30 feet around their perimeters to allow for error. In his opinion there was no possibility of live dud shells remaining in the unrestricted areas of tracts 113 and 166. The military dedudding teams comprised specially trained personnel with highly qualified and experienced officers in charge. The operations were efficiently conducted.
20. a. In addition to the shells found during the dedud-ding inspections described in findings 7, 17, and 18, shells were found at various other times on tracts 113 and 166.
b. In 1946 a live 105 mm. he howitzer shell was found in tract 113 south of restricted area 1. It was exploded on site by military personnel who declared it to be dangerous.
c. In the spring of 1947, after completion of the dedud-ding activity described in finding 7, the plaintiff commenced construction of a road 15 through tract 113 from its northeast to its southwest boundaries, skirting the west side of restricted area 1 which included Kaolin Hill, and terminating at the boundary of tract 166. During the early part of this construction six or seven 105 mm. smoke shells were found in an unrestricted area of tract 113 close to its bound *64 ary witli tract 166 and in another such area in the ravine north of Kaolin Hill. Military personnel were summoned to explode them. Again in 1948, while plaintiff was boring test holes in tract 113, other shells of unnamed types were found lying around or buried
d. In a later stage of constructing road 15, other shells were found on tract 113, at least one of which was a mortar shell said to be dangerous by military specialist assigned to attend the construction. Some of the shells referred to were buried 2 feet under the surface. On another occasion in 1949, plaintiff’s workmen cutting road 16 through an unrestricted part of tract 113 found 2 shells of undesignated types.
e. In 1950, 1951, 1952, and 1956 additional shells were discovered by plaintiff’s employees in restricted and unrestricted areas of tract 113. Most of these shells were expended smoke or practice shells, and therefore harmless even if their presence would make workmen apprehensive. But some shells discovered in unrestricted areas of tract 113 were live shells of varieties other than he, and they were exploded by defendant’s personnel.
f. Plaintiff has been under standing instructions to report to the Corps of Engineers each shell discovered on tracts 113 and 166, and such instructions have been observed by plaintiff. Each time such a report has been made, trained military personnel have been dispatched immediately to inspect and dispose of shells so found. Since the final dedud-ding project in the fall of 1949 there has never been reported to the Corps of Engineers any shell found on the tracts in question which turned out on examination to be a live he shell. All shells reported and removed since the fall of 1949 by the defendant from the unrestricted areas of either tract have been practice or smoke shells. At no time has a dud shell on tract 113 or 166 ever exploded by coming into contact with plaintiff’s personnel or heavy equipment either in cutting roads through or drilling numerous test holes in the tracts.
21. It is not possible from the record to determine precisely what types or numbers of shells have been found on tracts 113 and 166 since plaintiff’s postwar reentry, or how *65 many of tbem were live and how many expended, or how many were exploded by military personnel summoned to the scene, or whether and where any shells lie still concealed from view. However, based upon the profusion and variety of shells discovered over the years, the knowledge that many thousands of the shells fired were high-explosive in character, the presumption that a percentage of the total malfunctioned and failed to explode, the difficulty of detection of buried duds despite the thoroughness and frequency of search, it is reasonable to conclude that:
a. There lie buried and undetected at various and unknown locations within the top 6 feet of the unrestricted areas of tract 113, and substantially more within the restricted areas, a small number of unexploded he shells, lethal in character, and a larger, but not large, number of smoke, training, illuminating, and practice shells. Presence of the he shells would constitute a physical hazard to personnel and equipment engaged in mining. Presence of the other shells would constitute a mental hazard to personnel, but not a substantial physical hazard to either personnel or equipment.
b. These conditions do not pertain to tract 166, which is safe to mine.
22. Kaolin is a sedimentary clay deposited in strata in past geologic periods and covered since by an accumulation of earth commonly referred to in mining terminology as an “overburden”. The kaolin deposits in tracts 113 and 166, as in Twiggs County generally, are irregular in location, thickness and quality. In order to determine the location, thickness, depth, boundaries, and quality of the kaolin deposits on tracts 113 and 166, principally for the purposes of litigation, the plaintiff and defendant drilled some 161 holes on tract 113 and about 40 on tract 166. Cores from the drill-ings were preserved and scientifically analyzed, and the data thus obtained was recorded in drill logs and plotted on maps and schedules. These drillings were sufficient to determine whether the properties contained enough kaolin to justify additional exploration, but as a prerequisite to actual mining operations many more drillings would have been required. No unexploded shells were encountered or *66 detonated in the course of these exploratory drillings, many of which were made in impact areas on tract 113 whose use had been restricted by the defendant.
23. Kaolin producers today generally limit their operations to the mining of crude kaolin containing not more than 5 percent grit and having not less than 78 brightness. The grit standard means that no more than 5 percent of the day will fail to wash through screen mesh with 200 openings per square inch. The brightness test refers to a scale reading in tests performed with light-reflecting instruments such as the General Electric reflectometer. However, since crude clays in the same strata frequently vary widely both above and below the grit and brightness standards, it is customary practice to blend substandard clays with clays in excess of standards to obtain an aggregate product within acceptable tolerances. Excessive grit is readily removed in the refining process, although use of crude clay with excessive grit reduces the net yield of a given quantity of crude until a point of diminishing returns is reached at certain levels. Inadequate brightness in the crude is more difficult to counteract or control.
24. In addition to the grit and brightness requirements, to be commercially feasible for mining purposes kaolin deposits must have an overburden of less than 110 feet and a ratio to overburden of no greater than 5 to 1, that is, if the overburden requiring removal is more than five times the thickness of the kaolin deposit, the kaolin is not considered to be commercially feasible to mine.
25. From the data assembled by the drillings described in finding 22, expert witnesses for both parties estimated the quantity of mineable kaolin present on tracts 113 and 166. Since the data is susceptible to widely varying interpretations, a substantial conflict exists in the testimony of the parties’ experts as to the quantity, quality, and extent of mineable kaolin deposits on the two tracts. Reconciling the conflicts it is found that:
a. Tract 113 contains 2,700,000 cubic yards of commercially mineable kaolin, of which 125,000 cubic yards is within the 55.277 acres of restricted areas 1 and 2. An additional 1,000,000 cubic yards of kaolin contained in tract *67 113 would be commercially mineable except that its overburden ratio exceeds the 5 to 1 standard. The top 6 feet of the overburden above the 2,700,000 cubic yards of commercially mineable kaolin in tract 113 contains 875,000 cubic yards of earth, of which 40,000 cubic yards overlies that part of the mineable kaolin located within the 55.277 acres of restricted areas 1 and 2. The top 6 feet of the overburden above the 1,000,000 cubic yards of kaolin suffering from a prohibitive overburden ratio contains 350,000 cubic yards of earth.
b. Tract 166 contains 850,000 cubic yards of commercially mineable kaolin. The top 6 feet of the overburden above the mineable kaolin in tract 166 contains 375,000 cubic yards of earth.
26. Because of the condition of tract 113 as described in finding 21 a, the only feasible method of removing the kaolin deposits from tract 113 with a minimum of risk to personnel and equipment is to first remove the top 6 feet of overburden with specially armored earthmoving equipment. The additional cost of such an operation would average 12 cents per cubic yard, at times material to this litigation, representing principally the cost of armoring the equipment, the loss of efficiency inevitably resulting from the use of armored equipment, and the cost of additional insurance to protect both personnel and equipment against the consequence of injury and damage. Thus it would cost $105,000 more to remove the top 6 feet of overburden from the mine-able areas of tract 113, because of the conditions complained of, than if the tract were unaffected by such conditions.
valuation [1]
27. a. The principal methods practiced by the kaolin industry in acquiring kaolin-bearing land in the Georgia kaolin belt is (1) by option to purchase at a fixed rate per acre, with exploration rights, (2) by lease on a royalty basis according to tons of crude clay extracted, and (3) by outright purchase. Neither the option method nor the royalty method provide criteria for determining market value. All *68 three methods were in use in the period 1935 to 1941, with the option method most common. In succeeding years the royalty method grew in popularity. Kaolin property was not in 1940, nor has it been since, sold on the basis of tonnage known to exist in the ground. Plaintiff has been the most active member of the industry in acquiring kaolin properties in the general vicinity of tracts 113 and 166.
b. There was no shortage of kaolin in 1940 nor is there today. However, demand has been rapidly increasing, reserves of suitable grade kaolin have been depleting, competition among producers for reserve kaolin properties has been intensifying, and market prices for reserve properties have been increasing steadily. The plaintiff spends large sums annually in prospecting for kaolin properties. Since it costs approximately 9 cents per ton mile to haul crude clay to the processing plant, proximity to the processing plant and to transportation facilities are as important factors as quality of crude clay in determining the value of kaolin properties. It is not economically feasible to haul crude clay more than 15 miles to the processing plant. Thus tracts 113 and 166 were and are of more value to the plaintiff, with its nearby facilities, than to other producers with more distant processing facilities.
c. From 1935 to 1941 the option prices for kaolin property in the Georgia kaolin belt ranged from $7 to $35 per acre. In 1940 the royalty rate averaged 10 cents per ton of crude clay, and in 1955 varied from 15 cents to 35 cents per ton.
d. From 1935 to 1941 sales of kaolin property in the Georgia kaolin belt ranged from $7 to $42.85 per acre, as contrasted to non-kaolin farmland which then sold for $8 to $10 per acre.
e. The plaintiff purchased tract 113 in April 1940, in competition with other bidders, for $33.60 per acre, after deducting the sale price of growing timber. Approximately 30 test holes had been drilled by plaintiff prior to purchase, which were not enough to disclose the quantity or quality of kaolin in the property, and plaintiff did not know at the time of purchase, nor in 1947, the quantity or quality of kaolin in the property. Neither did plaintiff have that information as to tract 166 at those times.
*69 f. Record estimates of market value of tracts 113 and 166 varied widely, some of them being based on presently estimated quantities of kaolin in the ground which were not known at the valuation dates. It is reasonably concluded that the market value of tracts 113 and 166 in October 1940 was $33.60 per acre, or a total of $5,880 for tract 166 and $22,500 for tract 113. Had plaintiff had the same information in 1940 as it now has as to the quantity and quality of kaolin in the two properties, as reported in finding 25, the market value of the tracts would have been 20 cents per ton of commercially mineable kaolin.[2]
g. The market value of tracts 113 and 166 in 1947 was $52 per acre, or a total of $9,100 for tract 166 and $34,840 for tract 113.
PRIOR LITIGATION AND CONGRESSIONAL ACTION
28. In 1949 the present plaintiff filed suit in the United States District Court for the Middle District of Georgia to recover damages in the sum of $2,150,876.28 for diminution in the value of its land. This action was filed pursuant to the special jurisdictional Act of June 19, 1948, 62 Stat. 566, which provided as follows:
That jurisdiction is hereby conferred upon the District Court of the United States for the Middle District of Georgia to hear, determine, and render monetary judgment upon the several claims (1) of the city of Macon with respect to lands owned by the city and leased by the said city to the United States for use by the Army as a part of the site of Camp Wheeler, Georgia, for damages for the breach, if any, of its leases to the United States and (2) of the owners in fee simple and the owners of leasehold interests, except the city of Macon, in and to lands leased by them to the city of Macon, Georgia, and subleased by the city to the United States for such use. In the determination of the claims of the owners of the fee-simple titles and of leasehold interests in lands leased by them to the city of Macon and subleased by said city to the United States, the damages allowed, if any, shall be limited to the amounts to which such owners would have been entitled under the terms and provisions of their leases to the city of *70 Macon: Provided, That claims of fee owners and leasehold owners, excepting the city of Macon, relating to the same property shall be joined in one action and the amount of damages allowed, if any, shall not exceed the amount that could have been recovered had all the interests in such property been vested in one party. The claims of the city of Macon with respect to lands owned by it shall be determined under the terms and provisions of its leases of such lands to the United States. This Act shall be construed to waive the lack of privity of contract between the United States and the said fee owners or between the United States and the said leasehold owners; to waive the requirement of such leases to the city of Macon of notice by the lessors to the city in order for claims of restoration to be asserted, and to waive the immunity from suit of the United States in favor of the parties and with respect to the claims described in this Act, but not otherwise to affect any rights of the parties.
Sec. 2. Proceedings for the determination of these claims shall be had in the same manner as in cases against the United States of which the district courts of the United States have jurisdiction under the provisions of paragraph “Twentieth” of section 24 of the Judicial Code, as amended, but the monetary limit which is applicable in such cases shall not be applicable in the determination of these claims: Provided, That all suits hereunder shall be instituted within one year after the enactment of this Act.
29. In the District Court action, the plaintiff asserted that the entire two tracts had been totally destroyed and made useless for kaolin mining. The amount sought to be recovered represented the alleged value of the plaintiff’s property. Judgment was entered on January 5, 1953, in favor of the plaintiff in the sum of $22,537.50. The court found that the plaintiff’s lands, in October 1940, were worth $50 an acre and that plaintiff should recover the full value of the 56.5 acres in the restricted areas and one-half the value of the remaining 788.5 acres, making a total of $22,537.50. The award with respect to the lands outside the restricted area was made despite the court’s conclusion that the evidence disclosed very little, if any, likelihood of danger in the unrestricted area. This judgment was affirmed by the United States Court of Appeals for the Fifth Circuit (Georgia Kaolin Co. v. United States, 214 F. 2d 284 (1954), cert. den. 348 U. S. *71 914). Plaintiff has refused to accept payment of the judgment, although tendered by defendant.
30. The instant petition was brought pursuant to the mandate of House Resolution 250, 84th Congress, 1st session, which provides as follows:
Resolved, That the bill (H. R. 6401) entitled, “A bill for the relief of the Georgia Kaolin Company”, together with all accompanying papers, is hereby referred to the United States Court of Claims pursuant to sections 1492 and 2509 of title 28, United States Code; and said court shall proceed expeditiously with the same in accordance with the provisions of said sections and report to the House, at the earliest practicable date, giving such findings of fact and conclusions thereon as shall be sufficient to inform the Congress of the nature and character of the demand, as a claim legal and equitable, against the United States, and the amount, if any, legally or equitably due from the United States to the claimant.

 Although the present theory of plaintiff’s case does not rest on market •value, the data as to market value provided by the evidence is summarized fin finding 27.

 The value to plaintiff, because of the location of Its plant, would have been greater.